FILED
2015 Apr-28  PM 02:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | |
|---|---|
| **NELL C. DYSART**, | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ] |
| | ]   **CV-13-BE-2092-S** |
| **TRUSTMARK NATIONAL BANK, a** | ] |
| **corporation; DAVID B. ANDERSON;** | ] |
| **DEANNA L. WEIDNER; ANDERSON &** | ] |
| **WEIDNER, et. al.,** | ] |
| | ] |
| **Defendants.** | ] |

## MEMORANDUM OPINION

This foreclosure matter is before the court on cross motions for summary judgment:

"Defendant Trustmark National Bank's Motion for Summary Judgment on Plaintiff's Remaining

Breach of Contract Claim"  (doc. 48), and the motion for summary judgment that the *pro se*

Plaintiff filed "in the alternative" along with her sur-reply and motion to strike (doc. 58).  This

matter has received thorough briefing: in addition to Defendant's supporting briefs (doc. 48, 55

& 66) and evidentiary material (docs. 49-1 through 7 & 56-1), the Plaintiff has filed her

opposition brief (doc. 53) and a sur-reply (doc. 58), as well as evidentiary material (docs. 63, 64,

64-1, & 64-2).  For the reasons stated in this Memorandum Opinion, the court FINDS that the

Plaintiff's motion to strike is due to be GRANTED IN PART and DENIED IN PART; that the

Defendant's motion for summary judgment is due to be GRANTED; and that the Plaintiff's

motion for summary judgment is due to be DENIED.

# I. PROCEDURAL BACKGROUND

The Plaintiff, Nell C. Dysart, originally filed this suit ("Dysart IV") on October 11, 2013 in the Circuit Court of Jefferson County, Alabama, and on November 15, 2013, Defendant Trustmark removed it to this federal court based on diversity jurisdiction.  This suit is the fourth action that Dysart has filed complaining about alleged misdeeds relating to the foreclosure and sale of property that she formerly owned, and all of the previous actions have ended in dismissal. According to Trustmark, Dysart voluntarily dismissed the first action brought in state court alleging wrongful disclosure (Dysart I).  Subsequently, she filed two federal actions, each of which the court dismissed without prejudice for failure to state a claim on the federal allegations: *Dysart v. BankTrust,* No. 10-3521-IPJ (N.D. Ala. filed Dec. 20, 2010 and dismissed Jan. 7, 2011) (Dysart II) (alleging claims against both Defendants in the current lawsuit arising out of the foreclosure of her home on October 15, 2007:  RICO violations; breach of contract of a mortgage contract; slander of title; wrongful disclosure; abuse of process; violation of Fair Debt Collection Practices Act; and fraud/suppression/deceit); and *Dysart v. BankTrust, et. al.,* No. 11-1917-LSC (N.D. Ala. filed Dec. 20, 2010 and dismissed July 3, 2012) (Dysart III) (alleging claims against both Defendants in the current lawsuit, as well as additional defendants, relating to the foreclosure of her home on October 15, 2007:  fraud, RICO violations, breach of a mortgage contract, trespass, and intentional infliction of emotional distress).  Dysart appealed Dysart III, in which the district court had dismissed the federal claims and had refused to exercise jurisdiction over the state law claims; the Eleventh Circuit affirmed the district court's dismissal.

In addition to the other lawsuits, Dysart filed for Chapter 7 bankruptcy, No. 04-3798-TBB and for Chapter 13 bankruptcy, No. 04-9416-TBB.  Trustmark (then People's Bank and Trust

Company) filed an adversary proceeding, No. 07-0040-TBB, related to that bankruptcy case and addressing tax sales of Dysart's residence in which Dysart, the Jefferson County Tax Collector, and tax sale purchasers were also parties.  Dysart filed a separate adversary proceeding against the tax collector and one of the tax sale purchasers.

The original Complaint in the instant case asserted claims against Defendants in addition to Trustmark, but the court has since dismissed those claims and has dismissed all Defendants except Trustmark.   (Docs. 38 & 46). The Plaintiff's pleading has been, at times, a moving target. *After* briefing was completed on Trustmark's original motion to dismiss, the Plaintiff requested leave to file an amended complaint.  The court allowed the amendment, which was followed by a second motion to dismiss (doc. 23).  In the midst of the briefing on Trustmark's second motion to dismiss (doc. 20), the Plaintiff filed a motion for leave to file a second amended complaint (doc. 27), which the court denied (doc. 33).   The court did allow the Plaintiff to amend her trespass claim set out in Count III (doc. 40), and another round of motions to dismiss ensued.  As a result of Trustmark's motions to dismiss (docs. 20 & 41), the court dismissed all claims against Trustmark except the breach of contract claim asserted in Count I (docs. 38 & 46).  The court denied Trustmark's motion as to the breach of contract claim, which was based on a statute of limitations argument, but stated that the denial was without prejudice to Trustmark's raising the statute of limitations issue again at the summary judgment stage with supporting case law and evidence.  (Docs. 38 & 37, at 16).  Trustmark does not again raise the statute of limitations bar in the motion for summary judgment currently before the court.

Subsequent to the court's order on the motions to dismiss, the Defendant filed the current motion for summary judgment.  (Doc. 48).  Along with her sur-reply to the Defendant's motion,

3

the Plaintiff filed her own motion for summary judgment and motion to strike David Anderson's affidavit.  (Doc. 58).

## II.  MOTION TO STRIKE

As part of her sur-reply (doc. 58), Dysart requested that the court strike Attorney David Anderson's affidavit (doc. 56-1).  David Anderson's affidavit was originally filed in Dysart III. When Trustmark re-filed it in this case, it only filed 5 of the 31 exhibits that the affidavit purported to attach.  In her motion, Dysart asserts that "[w]hat appears to be happening here is that, Trustmark is asking this Court to consider all of the exhibits that Mr. Anderson has attached and filed in a previous Dysart v. Trustmark action.  Not just the ones referenced in the Reply." (Doc. 58, at 8).  The court notes that in its Reply brief, Trustmark explains as follows: "Trustmark is filing the affidavit [of David B. Anderson] as Exhibit A to its Supplemental Evidentiary Submissions, but is omitting some of the exhibits on which it is not specifically relying, or which are otherwise already part of the record in this case, to reduce the volume of the filing.  The full text and all exhibits to the original affidavit of Anderson can be found in 2:11-cv-01917-LSC. . . ." (Doc. 55, at 3 n. 3).

Based on Trustmark's explanation that it does not rely on any affidavit exhibits *not* filed in this case, a statement borne out in the facts and arguments presented in Trustmark's Reply brief, the court must conclude that Dysart has misunderstood or misread the information in that brief.  Accepting the limits that Trustmark proposes, the court does not agree that Anderson's affidavit is immaterial and in violation of Rule 56(c)(4), as Dysart alleges.  Indeed, Dysart does not provide any specific objections about any of the statements in the affidavit or the exhibits attached in this action; the only specific objection she presents regards the foreclosure deed, an

4

exhibit that is *not* one of the attachments to the affidavit filed in *this* case.   The court finds that Dysart's objection is not well taken because Trustmark does not rely on the document to which she objects.

Dysart makes a general assertion that Anderson's affidavit was not made on personal knowledge; however, Anderson avers that he has "personal knowledge of the facts contained herein and those facts are true and correct."  (Doc. 56-1, at 3).  The court has no reason, and Dysart presents no reason, to disbelieve that statement.  As to the exhibits attached to Anderson's affidavit in *this* case, which Anderson avers are true and correct copies, the court notes that three of the five attached exhibits are business record documents, correspondence either to or from the law firm in which Anderson is a partner regarding a case in which Anderson served as counsel. The other two documents are bankruptcy court records in the Chapter 13 case in which Anderson served as counsel.  To the extent that any doubt exists whether Anderson can testify about the correctness of those records, and to avoid delay, the court takes judicial notice that Exhibits 23 and 24 to Anderson's affidavits are true and correct copies of those documents in Case No: 04-9416-TBB-13 in the United States Bankruptcy Court, Northern District of Alabama, Southern Division.

The court notes, however, that Trustmark's Reply brief does refer in a footnote to *Dysart III* and explains where "all exhibits to the original affidavit of Anderson can be found." Recognizing that this reference could be the genesis of Dysart's objection that Trustmark's Reply represented an attempt to incorporate by reference all exhibits to the original affidavit, the court will GRANT IN PART and DENY IN PART the motion to strike. The court FINDS that the motion is due to be  DENIED to the extent that it requests the striking of Anderson's affidavit as

filed in this case with the five attached exhibits.  Given Dysart's interpretation of the Reply brief, in an abundance of caution to preserve clarity, the court FINDS that the motion is due to be GRANTED to the extent, if any, that Anderson's affidavit incorporates by reference exhibits attached to the original Anderson affidavit in Dysart III *but not attached to the Anderson affidavit filed in the instant case*, or otherwise attempts to attest to the correctness of the copies of Anderson affidavit exhibits not filed in this case; the court STRIKES any reference to exhibits that are listed in the Anderson affidavit but not attached to the Anderson affidavit in *this* case, and that are not filed elsewhere in the record of *this* case.

## II.  FACTS

*Dysart Loan and Mortgage on Manchester Court Residence*

On August 30, 2002, Plaintiff Nell C. Dysart and Trustmark entered into a Fannie Mae/Freddie Mac uniform instrument that included a note in the amount of $210,000.00, loan number 4464877117 secured by a mortgage on Dysart's personal residence on Manchester Court in the City of Vestavia Hills, Jefferson County, Alabama.  That mortgage stated in relevant part:

> 15.  **Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. . . .If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.
>
> 18.  **Transfer of the Property or a Beneficial Interest in Borrower.**   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or part of the property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. . . .

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.  Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) case; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. . . .

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may

result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

(Doc. 1-1, at 33-34 & 35).

*Trustmark Loans to EMER*

Trustmark also entered into other commercial loans to a family-owned underground utility company named Environmental Management and Emergency Response, Inc. ("EMER"), the company in which Nell Dysart held the position of Vice-President.  The president of EMER, her son, Stuart Dysart, guaranteed one of those Trustmark loans, loan 4400000526, but Nell Dysart did not personally do so.  Both Stuart and Nell Dysart executed and guaranteed a separate loan, loan 4600099015 in the amount of $60,175.00, but Nell Dysart refused to use her residence as collateral for that loan.  These loans are not a part of this breach of contract action, but Trustmark was aware of these other loans as it made decisions on how to proceed on Dysart's mortgage.

*Deficiencies in Loan Payments and Dysart's Chapter 7 Bankruptcy*

In 2004, Dysart received a letter from Trustmark's attorney advising her that the note secured by the mortgage on her Manchester Court property was in default.  Dysart attempted to make a late mortgage payment, which Trustmark did not accept because it did not cover all payments due with accrued interest and fees.

On April 27, 2004, Dysart filed for Chapter 7 bankruptcy relief.  In that document, she listed the tax collector as creditor for the past due 2003 property taxes on her home. She also listed on the Bankruptcy schedule her debt on the Trustmark note, but not as an accelerated debt. Under the statement of intention, Dysart indicated that she planned to surrender her residence to Trustmark.  Dysart testified that, despite her intention, Trustmark instead offered her an opportunity to reinstate her mortgage by curing the arrearage.

In May of 2004, the Jefferson County Tax Collector conducted a tax sale of Dysart's Manchester Court property, and Plymouth Park Tax Services, LLC was the purchaser.  The record does not reflect that the tax collector received a lift of the bankruptcy stay prior to the sale. In a subsequent adversary proceeding in Bankruptcy Court, the bankruptcy judge entered an Order finding that the tax sale was null and void based on the parties' stipulations to that effect.

On June 4, 2004, Trustmark filed a "Motion to Terminate Automatic Stay" to permit it to "foreclose or otherwise proceed" against Dysart's Manchester Court home.  As grounds, Trustmark stated that she had defaulted on her debt, and that no payment had been made on the mortgage since January 2004 and that, as of a March 2004 title search, the 2003 ad valorem taxes had not been paid.  The motion also referenced a March letter giving Dysart 30-days notice that Trustmark would proceed with foreclosure unless payment was made, and stated that the thirty days had expired without payment.

On July 19, 2004, the Order of the bankruptcy judge in the Chapter 7 bankruptcy case, Case No. 04-3798-TBB-7,  indicates that the court held a hearing on Thursday, July 15, 2004 on motions for relief from the stay filed by Trustmark and another party, and granted relief from the stay.

9

The next month, Dysart accepted Trustmark's offer to cure her arrearage; she tendered to Trustmark an official check from America's First Federal Credit Union dated August 13, 2004 in the amount of $14,119.17 paid to the order of "Nell C. Dysart or Walston Wells Anderson Bains LLP for Peoples Bank/Manchester Ct" with a notation "Received by: Emily Creel 8-13-14 4:50 pm." (Doc. 53, at 36).  Dysart testified that Trustmark's acceptance of this check represented reinstatement of the mortgage pursuant to that instrument's paragraph 19.  She received a discharge from Chapter 7 bankruptcy in August of 2004.

*Dysart's Chapter 13 Bankruptcy*

Two-and-a-half months after her discharge, on October 26, 2004, Dysart filed for bankruptcy again, this time for Chapter 13 relief in Case 04-9416-TBB-13, to address past due taxes and student loans. The record reflects that she was represented by counsel in this bankruptcy proceeding.  She listed Trustmark as a creditor holding a secured claim, and listed Plymouth Park Tax Services, LLC, the tax sale purchaser of the Manchester Court property, as a creditor holding an unsecured priority claim.

In May of 2005, prior to confirmation, Dysart filed an adversary proceeding against Plymouth Park Tax Services, LLC and the Jefferson County Tax Collector, demanding that the tax collector surrender possession of an overbid from a tax sale of *rental* property.  This adversary proceeding complaint did not reference the Manchester Court property, but the Order approving the compromise in the adversary proceeding also referred to the *Manchester Court property*, compelling the collector to pay a sum on behalf of the debtor to the bankruptcy trustee to partially satisfy Plymouth's claim against the Manchester Court property, and requiring Plymouth to file an amended claim for any deficiency regarding that property, to be paid through

10

Dysart's Chapter 13 Plan.

On December 13, 2005, Dysart's Chapter 13 Plan was confirmed, requiring monthly payments to Plymouth on the Manchester Court property.

On May 23, 2006, the Jefferson County Tax Collector purported to sell the Manchester Court property for a second time, this time to Heartwood 88 LLC for $64,000, and neither the tax collector nor Heartwood received relief from the Chapter 13 automatic stay.

On October 12, 2005, the bankruptcy court in the Chapter 13 case entered on order approving a compromise between the tax collector and Dysart in which the tax collector would pay a sum of $38,000.00 to the Chapter 13 Trustee on behalf of Dysart and the Trustee in turn would pay that amount to Plymouth Park Tax services in partial satisfaction of its claim against Dysart's residential property at Manchester Court.  Plymouth Park would then file an amended claim in the bankruptcy case for any remaining deficiency after that payment, and the debtor would pay the deficiency to redeem her home place through the Chapter 13 proceeding. Upon Dysart's payment of the deficiency, Plymouth Park would execute a quit claim deed to convey its interest in the property to Dysart.

On October 5, 2006, Trustmark wrote Dysart a letter regarding loan 44648771117, advising her that its records indicated that the insurance on her property has been cancelled, that the bank has force-placed insurance, and that, within five days, she must either pay the premium for the force-placed insurance or fax proof of insurance with effective dates.  The record does not reflect Dysart's response.

On January 23, 2007, counsel for Trustmark in Dysart's Chapter 13 Bankruptcy case filed a "Motion for Determination that Automatic Stay Does Not Apply or in the Alternative to

Terminate Automatic Stay."   In that motion, Trustmark argued that because Dysart did not include her debt to Trustmark in her plan and paid her debt outside the plan, the residence was not necessary to the fulfillment of the plan and was no longer property of Dysart's bankruptcy estate.   Thus, it asked for a ruling that the property was not part of the bankrupt estate and that it could proceed to accelerate the indebtedness and foreclose on the property without obtaining relief from the automatic stay.   However, alternatively, the motion argued that if the property were found to be part of Dysart's bankruptcy estate, Dysart's failure to maintain insurance on the property constituted "cause" under 11 U.S.C. § 362(d)(1) for granting Trustmark relief from the stay. (Doc. 50-3).

On February 13, 2007, Trustmark filed an "Amended Motion to Terminate Automatic Stay" in Dysart's Chapter 13 case, deleting the argument that Dysart's residence was not property of the estate.   In its amended motion, Trustmark asked the court to grant relief from the automatic stay because Dysart was in default on the mortgage, and, thus, "cause" existed for relief under 11 U.S.C. § 362(d)(1).   Trustmark's argument regarding default relied not only on its argument in the January 2007 motion that Dysart had failed to pay *insurance* on the property, but also on a new argument that Dysart had also failed to pay *taxes* on the property since 2002.   The amended motion stated that on October 27, 2006, Trustmark gave notice to Dysart that she was in default and demanded payment, that 60 days had expired since such notice, and that the debt was subject to acceleration because Dysart did not cure the default within that 60-day period. The motion gave the current amount of indebtedness, explained that interest continued to accrue, provided the premium cost for the lender-placed insurance coverage, and included contact information for Trustmark's attorney.   The amended motion referred to the tax sale on rental property and to

12

Plymouth as a creditor on the Manchester Court property, but did not specifically give the tax

sale as a reason for acceleration. (Doc. 50-4).

Dysart denies receiving the October 27, 2006 letter referenced in the amended motion,

and claims that she has requested a copy of this letter but that Trustmark has never provided it to

her.  The October 27, 2006 letter is not a part of the record in this case.

However, Dysart admits receiving service of both the January 2007 motion and the

February 2007 amended motion; both documents were served on her individually at the address

listed on the mortgage; and served by delivery to her counsel.   Dysart claims in the instant case

that some of the allegations in these motions are incorrect.   She claims that she had

homeowner's insurance in place on the Manchester Court property "except for a few months,"

and that Trustmark was wrong to force-place coverage in July 2007 because she had already

purchased insurance at that time.  She further claims that she paid 2003 taxes.  However, Dysart

acknowledges that she did not file anything in the Chapter 13 bankruptcy action opposing the

motion as amended.   Further, she filed no *evidence* in the instant action regarding the date she

obtained homeowner's insurance on the Manchester Court property and the date she notified

Trustmark of that purchase with a copy of the insurance and its effective date; she provides only

evidence of an ALFA insurance cancellation refund dated December 20, 2007.

On March 13, 2007, Trustmark filed an adversary proceeding complaint against

Plymouth, Heartwood, the Jefferson County Tax Collector and Dysart to void both tax sales on

the Manchester Court property.[1]  Counsel for Plymouth, Heartwood, and the tax collector

---

[1]  Trustmark now takes the position that the tax sales, which it had previously asserted to
be void, allowed Trustmark to accelerate the debt pursuant to ¶ 18 of the mortgage without
following ¶ 19's notice requirements.  Dysart argues that if the tax sales were truly void, a void

stipulated that the tax sales were void.

On June 8, 2007, Trustmark sent Dysart a letter regarding Loan 4464877117 covering her Manchester Court residence, stating:  "Our records indicate that your insurance on the above property will cancel on **July 20, 2007."**  The letter provided Dysart with the deadline of July 20, 2007 to fax proof of insurance with effective dates or to pay the specified premium for force-placed insurance.  (Doc. 53, at 40).  Trustmark had previously sent Dysart a letter on October 5, 2006 advising her that it had purchased force-placed insurance effective 7/20/06 to 7/20/07.

On July 20, 2007, Trustmark's attorney sent Dysart's attorney a letter setting forth information regarding the amount owed Trustmark, $17,000, for force-placed insurance and fees spent to void the Manchester Court tax sales as well as property taxes plus interest owed on the Manchester Court residence.  The attorney requested that Dysart advise him by July 27, 2007 of how she intended to "bring her taxes current and pay the past due amounts owed to [Trustmark]." The letter attached a document from the tax collector's office dated May 15, 2007 and reflecting the amounts of taxes plus interest due for the tax years 2003-2006, and also attached a document listing payments Plymouth received from Dysart's Chapter 13 case.  (Doc. 50-5, at 2).

On August 7, 2007, Attorney Deanna Weidner sent a follow-up email on behalf of Trustmark to Dysart's attorney, stating: "I have not heard from you in response to my correspondence of July 20, 2007.  This letter is to confirm that Ms. Dysart is either not willing or able to bring her obligations to [Trustmark] current.  Accordingly, we will proceed with our lift stay motions, which is scheduled to be heard on August 22, 2007, after which we will begin foreclosure of Ms. Dysart's residence.  If you would like to discuss this matter further, please

---

sale does not invoke ¶ 18's acceleration provision.

give me a call." (Doc. 56-1, at 10). Dysart denies that her attorney notified her of these communications. She provides evidence in the instant action that on March 11, 2003, she paid taxes the amount of $3,144.23 for the Manchester property, but does not provide evidence that she paid taxes for other years, or that the amount paid in 2003 was the correct amount to bring her taxes current for 2003.

On August 8, 2007, Trustmark submitted a trial brief to the bankruptcy court in the Chapter 13 case, and served the brief on Dysart and her counsel. In that trial brief, Trustmark again asserted that Dysart was in default under the mortgage because she had failed to maintain insurance and had failed to cure her default when Trustmark notified her of the default prior to July 20, 2006 and demanded that she cure it. The trial brief also asserted that Dysart was in default under the mortgage because she failed to pay all property taxes assessed to her residence, and set out the current amount of indebtedness, stating the principal amount, the amount of interest, the cost of force-placed insurance, and the rate of interest accruing on the principal and the insurance premiums. Finally, the trial brief asked for the following relief:

> [Trustmark] lacks adequate protection and is otherwise entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1). Pursuant to terms of her mortgage, Dysart was given notice that she was in default and payment was demanded. No such payment was made and many months have expired since Dysart was provided with notice. Therefore, the indebtedness secured by the mortgage is due to be accelerated and upon the termination of the automatic stay, [Trustmark] is entitled to immediately proceed with advertising the foreclosure sale of the mortgaged property.

(Doc. 50-7, at 4-6, & 8). Dysart acknowledges receiving this trial brief, but asserts that receiving such a trial brief does not comply with the notice provisions in the mortgage. She did not file any opposition to the motion to lift the bankruptcy stay.

15

On the morning of August 22, the date of the trial regarding the tax sales and the hearing to lift the automatic stay, Dysart's counsel informed Trustmark's counsel that "there was nothing he or the Debtor could do to avoid foreclosure and that he was not going to attend the trial or the hearing."  (Doc. 56-1, at 6).

On September 4, 2007, the bankruptcy court entered two orders in Dysart's Chapter 13 proceedings: an "Order Granting Relief from Automatic Stay" (doc. 1-1, at 39) and an "Agreed Order" (doc. 1-1, at 40) in that case and in a related adversary proceeding based on a stipulation of the parties.  In the first Order, the court granted relief from the automatic stay, stating: "it is hereby ORDERED, ADJUDGED AND DECREED the automatic stay in this Bankruptcy Case shall be and hereby is terminated with respect to the secured claim of [Trustmark] and [Trustmark] is hereby *authorized to foreclose its mortgage against the Debtor's residence*." (Doc. 1-1, at 39) (emphasis added).  In reaching that conclusion, the bankruptcy judge stated that he had considered "the schedules and proof of claim that establish an undisputed secured debt due [Trustmark], the failure of the Debtor to pay for insurance and ad valorem taxes related to the property and the lack of any opposition to the Motion . . . ." *Id*.

The Agreed Order was based on the stipulation of Trustmark, the tax collector, Dysart and the two tax sale purchasers, Plymouth Park Tax Services LLC, and Heartwood '88 LLC. The Order stated that the Jefferson County Tax Collector had conducted two tax sales of Dysart's residence: one in May of 2004, when Dysart was a Chapter 7 debtor, with Plymouth Park Tax Services LLC as the purchaser; and one in May 23, 2006, when Dysart was a Chapter 13 debtor, with Heartwood '88 LLC as the purchaser.   The Order further stated that in May 2005, Dysart filed an adversary proceeding in the Chapter 13 bankruptcy case against Plymouth and the tax

16

collector, resulting in the tax collector's releasing the Plymouth Excess Bid and in payments made to Plymouth on the excess bid and pursuant to Dysart's Chapter 13 plan.  However, the Order stated that Heartwood had not received any payments from Dysart's Chapter 13 case toward the amounts it paid at the tax sales and subsequent taxes paid in December 2006. Accordingly, the bankruptcy judge Ordered as follows: (1) "[t]he May 25, 2004 tax sale and the May 23, 2006 tax sale are null and void and title to the Residence is vested in Nell Dysart."; (2) the court also ordered certain sums of tax sale money and other taxes be refunded to the tax sale purchasers, and dismissed Plymouth and Heartwood from the Adversary Proceeding; and (3) the court ordered that "interest and penalties shall not accrue upon the taxes due until November 15, 2007." (Doc. 1-1, at 42).

The record does not reflect that Dysart appealed the September 4, 2007 "Order Granting Relief from Automatic Stay."

On September 11, 2007, Dysart's attorney sent a letter to Deanna Weidner, Trustmark's attorney, asking "would the bank entertain nell paying an addl 300 per month and staying current stave off foreclosure." (Doc. 56-1, at 13).  In his affidavit, Weidner's partner David Anderson testified that Dysart's attorney had notified their firm "that Dysart could not bring her indebtedness current or pay any other amount satisfactory to [Trustmark[. [Dysart's attorney] claimed that $300 per month was all that Dysart could afford." (Doc. 56-1, at 6).  Attorney Anderson advised Dysart's attorney that Trustmark would not accept $300 per month, and Dysart's attorney acknowledged that "nothing else could be done and that Ms. Dysart understood that the house would be sold at foreclosure." (Doc. 56-1, at 6).

Dysart acknowledges that Trustmark advertised her home for foreclosure sale in the

Alabama Messenger on September 22 and 29, and October 6, 2007.  Following these advertisements, Trustmark foreclosed on the property and sold the home on October 15, 2007.

On December 20, 2007, ALFA Insurance Agency paid Dysart $498.20 as a refund on cancelled policy #DFS0626427.  The refund document does not state when Dysart took out the policy or what the policy covered.

### III.  LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine

18

issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant. *Id*. at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'"  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## IV.  DISCUSSION

The only claim that remains in this suit is Dysart's claim that Trustmark's foreclosure and sale of her home breached the notice provisions of the mortgage contract between the parties.  In

support of its motion for summary judgment, Trustmark argues (1) that *res judicata*/collateral

estoppel bars the breach of contract claim; and, alternatively, (2) that no breach exists because

Dysart received sufficient notice.  If Trustmarks's first argument is successful, then the court is

precluded from reaching the merits of the notice issue; accordingly, the court will address the

preclusion issue first.

### A.  *Res Judicata /*Collateral Estoppel

Trustmark first argues that, in the Bankruptcy Court proceeding in Dysart's Chapter 13

case, the Bankruptcy Court authorized Trustmark to proceed with foreclosure; thus, that court

addressed the issue of whether Trustmark had complied with all provisions of the mortgage

contract and resolved that issue in Trustmark's favor in issuing the authorization.  In light of the

Bankruptcy Court's ruling, the argument proceeds, *res judicata* and/or collateral estoppel

preclude the revisiting of whether Trustmark had complied with the notice provisions of the

mortgage contract before foreclosing on Dysart's property.

The preclusive effect of a prior order or judgment is an issue that encompasses both claim

preclusion (*res judicata*) and issue preclusion (collateral estoppel).   To determine whether either

of those doctrines applies to the instant case, this court must look to federal common law[2],

because the order proffered as preclusive occurred in federal bankruptcy court; "federal

---

[2] In its Memorandum Opinion on Trustmark's motion to dismiss, this court assumed that
the issue of preclusion was properly determined based on state law because the case was
removed based on diversity (doc. 37, at 13), and because Trustmark's brief cited law stating that
state law on preclusion governs in diversity cases.  (Def.'s Br. Doc. 8, at 10).  Although
Trustmark continues to take the position in its brief on summary judgment that Alabama law on
preclusion applies (doc. 49, at 13-14), the court conducted further research and finds instead that
*federal* common law applies where the previous decision at issue is by a federal court, here a
bankruptcy court.  *See Tampa Bay Water v. HDR Eng'g, Inc.,* 731 F.3d 1171, 1179 (11th Cir.
2013).

21

preclusion principles apply to prior federal decisions, whether previously decided in diversity of federal question jurisdiction." *Tampa Bay Water v. HDR Eng'g, Inc.,* 731 F.3d 1171, 1179 (11th Cir. 2013) (quoting *CSX Transp. Inc. v. Bhd. of Maint. of Way Emps.,* 327 F.3d 1309, 1316 (11th Cir. 2003)).  The following elements must exist for the doctrine of *res judicata* to bar further litigation on a claim:  "(1) there is a final judgment on the merits, (2) the decision was rendered by a court of competent jurisdiction; (3) the same cause of action is involved in both cases; and (4) the parties, or those in privity with them, are identical in both suits." *Baloco v. Drummond Co., Inc.,* 767 F.3d 1229, 1246 (11th Cir. 2014).

Given the context of the ruling that Trustmark proffers as a bar —the lifting of a stay in bankruptcy—the court does not agree that the *cause of action* placed before the bankruptcy court is the same as that placed before this court as required for *res judicata*.  "The now-accepted test in preclusion law for determining whether two suits involve the same claim or cause of action depends on factual overlap, barring 'claims arising from the same transaction.'" *U.S. v. Tohono O'Odham Nation,* ____ U.S. ____, 131 S. Ct. 1723, 1730 (2011) (quoting *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 482 n. 22 (1982)).   The purpose of the bankruptcy action was the establishment of a wage earner's plan to repay Dysart's debts; in that bankruptcy action, Dysart did not assert that Trustmark committed any wrong against her, and establishing that plan required no evidence about whether the notice Trustmark provided to Dysart about her breach, acceleration and foreclosure complied with the mortgage contract.[3]

Two adversary proceedings occurred in connection with that bankruptcy: Trustmark filed

---

[3]  Trustmark did assert that the bankruptcy court should lift the stay because it had the right to foreclose.  As discussed subsequently, however, Trustmark has not established that the bankruptcy court's lifting the stay in bankruptcy was a final adjudication on the merits.

a proceeding against the tax sale purchasers and Dysart to void both tax sales, and Dysart filed an

adversary proceeding against the tax collector and one of the tax sale purchasers but not against

Trustmark.  Accordingly, the evidence and factual presentation in the only adversary proceeding

in which Trustmark  presumably addressed whether a tax sale, an event that was separate from

and occurred long before the foreclosure, was void.  Indeed, the record does not reflect that

Trustmark had any involvement in the tax sale.  In the adversary proceeding that Trustmark filed,

the record does not reflect that Dysart claimed that Trustmark committed any wrong against her

and does not reflect that Dysart specifically challenged the correctness of any impending

foreclosure based on faulty notice or based on any other reason.  Accordingly, the adversary

proceedings contained no factual overlap with the claim in the instant case.

Thus, the court finds that Trustmark did not meet its burden of establishing that the

claims addressed in the bankruptcy proceedings were the same as that addressed in the instant

action, which is wrongful foreclosure based on faulty notice.

Further and more importantly, Trustmark has not established that the bankruptcy court's

lifting the stay in bankruptcy was a final adjudication on the merits.  The bankruptcy court

certainly stated, in lifting the stay, that Trustmark was authorized to foreclose.   The real issue

here, however, is whether the bankruptcy court's order lifting of the stay with that statement was

a final adjudication on the merits of Trustmark's right to foreclose under the mortgage contract

*or* was simply an order lifting the stay and allowing Trustmark to foreclose to the extent, if any,

the mortgage contract and the law allowed it to do so.

In its decision of *In re Saylors,* 869 F.2d 1434 (11th Cir. 1989), the Eleventh Circuit

found that a bankruptcy court's lifting of an automatic stay in bankruptcy and confirming the

mortgage debt due to the creditor holding the mortgage was *not* an adjudication on the merits of

the right to foreclose.  In that case, the Court of Appeals addressed Defendant Jim Walter's

argument that the bankruptcy court's order lifting the automatic stay in bankruptcy was a final

adjudication of Jim Walter's right to foreclose, and further, that the doctrines of *res judicata* and

collateral estoppel precluded the re-adjudication of that claim and issue.  The Eleventh Circuit

rejected Jim Walter's argument as having "no merit," explaining: "The bankruptcy court's order

... merely lifted the automatic stay in the chapter 7 case.  In no way did the order purport to be a

permanent adjudication of Jim Walter's right to foreclose."  *Id.* at 1438.

The *Saylors* decision's characterization of the lifting of a bankruptcy stay as a preliminary

but not final adjudication is consistent with decisions from other Circuits.  In *Grella v. Salem*

*Five Cent Savings Bank,* 42 F.3d 26 (1st Cir. 1994), the First Circuit Court of Appeals

characterized the issue before it as one of issue preclusion, as opposed to claim preclusion.

However, its reason for finding no preclusion coincides with the reasoning in *Saylors*; the First

Circuit explained that a hearing on a motion to lift the bankruptcy stay is not a proceeding for

determining the merits of the underlying substantive claims and defenses.  It noted that the

"preliminary, summary nature of the relief from stay proceedings, have led most courts to find

that such hearings do not involve a full adjudication on the merits of claims, defenses, or

counterclaims, but simply a determination as to whether a creditor has a colorable claim to

property of the estate."  *Id.* at 32.  Similarly, the Fourth Circuit found that a hearing to lift a

bankruptcy stay is summary in character, and counterclaims are not precluded later if not raised

at this stage.  *See Estate Constr. Co. v. Miller Smith Holding Co., Inc.,* 14 F.3d 213, 219 (4th

Cir. 1994); *see also Nat'l Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 658 (Bankr.

S.D.N.Y.), *aff'd,* 962 F.2d 1 (2nd Cir. 1991) (finding that the decision to lift stay does not

involve determination of counterclaims, and thus, those claims are not precluded later).  The

Ninth Circuit agreed that relief-from-stay-hearings are limited in scope, focusing on adequacy of

protection, equity, and necessity to an effective reorganization, and stated that such hearings do

not litigate the validity of underlying claims.  *In re Johnson,* 756 F.2d 738, 740 (9th Cir.), *cert.*

*denied,* 474 U.S. 828 (1985).

Trustmark did not cite or attempt to distinguish the controlling *Saylors* decision.  Instead,

it cited two non-controlling cases for the proposition that granting a motion for relief from stay is

also a final judgment that can be given *res judicata* effect.  *See Shields v. Federal Nat'l Mortg.*

*Ass'n,* 1992 WL 687866 (S.D. Ala. 1992) (an unpublished appeal from a bankruptcy court's

overruling Fannie Mae's objection to the Bankruptcy Plan that set aside Fannie Mae's earlier

foreclosure); *Jefferson v. Mississippi Gulf Coast YMCA, Inc.,* 73 B.R. 179, 181-82 (Bankr. S.D.

Miss. 1986) (an adversary proceeding in bankruptcy court to set aside a foreclosure sale).  In light

of the controlling Eleventh Circuit caselaw cited above, and the rulings of other Courts of Appeal

that are consistent with that decision, the court need not address and distinguish those non-

controlling decisions.

As Trustmark points out, the doctrine of *res judicata* bars relitigation not only of matters

that were actually litigated but also those that *could have been litigated* in the earlier proceeding.

*See Magnolia Petroleum Co. v. Hunt,* 320 U.S. 430, 435 (1943).  However, again, regardless of

whether the bankruptcy court actually addressed the appropriateness of foreclosure and the

adequacy of notice prior to foreclosure in its hearing on lifting the bankruptcy stay, or whether

Dysart had an opportunity to raise those issues in the stay proceeding, the preliminary and

summary nature of the stay proceeding means that no final adjudication would have occurred on the merits as required for the application of *res judicata.*  Accordingly, that doctrine does not apply.  *See also In re Price,* 1992 WL 12004521, at *3, Case No. 92-10834 (Bankr. S.D. Ga. Sept. 11, 1992) (quoting *Saylors'* language with approval) .

As to the doctrine of collateral estoppel, in the Eleventh Circuit, a party invoking that doctrine must establish the following elements: "'(1) the issue at stake is identical to the one involved in the earlier proceedings; (2) the issue was actually litigated in the earlier proceeding; (3) the determination of the issue must have been a critical and necessary part of the earlier judgment; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue.'" *Madura v. Bac Home Loans Servicing,* 593 F. App'x 834, 843 (11th Cir. 2014) (quoting *Hart v. Yamaha-Parts Distribs., Inc.,* 787 F.2d 1468, 1473 (11th Cir. 1986)).   Unlike *res judicata*, which "bars relitigation of matters that were litigated or could have been litigated in an earlier suit[,]" collateral estoppel "requires that the identical issue in question was actually litigated and necessary to the judgment of an earlier suit."  *Manning v. City of Auburn,* 953 F.2d 1355, 1358 (11th Cir. 1992); *see also Dormescar v. U.S. Attorney Gen.*, 690 F.3d 1258, 1268 n. 9 (11th Cir. 2012) (quoting *Manning* with approval).

The court finds that Trustmark has not established all the elements of collateral estoppel; more particularly, it has not established that the breach of contract issue was actually litigated in the bankruptcy proceeding, and that it must have been a critical and necessary part of the bankruptcy court's  judgment.  The court acknowledges that Trustmark's brief in support of its motion to lift the stay in bankruptcy stated that it had given notice to Dysart of her default under the mortgage contract.  Thus, in that brief, it claimed to have complied with mortgage contract

notice provisions, and Dysart now challenges its compliance in the present action. Although she was represented by counsel in the Chapter 13 proceeding, Dysart did not oppose the lifting of the stay and did not raise the issue of faulty notice.  The bankruptcy court subsequently "ORDERED, ADJUDGED AND DECREED the automatic stay in this Bankruptcy Case shall be and hereby is terminated ...and [Trustmark] is hereby authorized to foreclose its mortgage against Debtor's residence."  ( Doc. 1-1, at 39 ).

Accordingly, the record reflects that the adequacy of notice pursuant to the mortgage contract was not an issue that was actually litigated.  Trustmark points to the fact that the bankruptcy court stated that Trustmark was entitled to foreclose, and thus, asserts that its right to foreclose was actually litigated within the meaning of the collateral estoppel doctrine.  As previously noted, the Eleventh Circuit rejected a similar argument in *In re Saylors* as having "no merit."  869 F.2d at 1438.  The Court of Appeals found that neither the doctrine of *res judicata* nor that of collateral estoppel precluded the plaintiff's right to subsequently attack the creditor's right to foreclose.  *Id. See also Grella,* 42 F.3d at 32 (addressing the effect of a decision lifting a bankruptcy stay as one of issue preclusion and determining that no preclusion existed for such proceedings because of their "preliminary, summary nature"); *Strickland v. Wells Fargo Bank,* 2014 WL 7003772, at *2, Case No. 14-CV-00186 (M.D. Ga. Dec. 10, 2014) (quoting the following language in *Grella* with approval:  "the only issue properly and necessarily before a bankruptcy court during relief from stay proceedings is whether the movant creditor has a colorable claim; thus the decision to lift the stay is not an adjudication of the validity or avoidability of the claim, but only a determination that the creditor's claim is sufficiently plausible to allow its prosecution elsewhere.").  .

In sum, this court FINDS that neither the doctrine of *res judicata* nor the doctrine of collateral estoppel applies, and that the bankruptcy court's order lifting the stay in bankruptcy does not preclude this court from addressing Dysart's breach of contract claim in this subsequent action.

## B.  Merits of the Breach of Contract Claim

Having determined that no preclusion doctrines prevent it from addressing the merits of the breach of contract claim, the court must next determine whether Dysart has established her *prima facie* case for breach of contract.  The elements for that claim are: "(1) the existence of a valid contract binding the parties, (2) [her] own performance under the contract, (3) the defendant's nonperformance under the contract, and (4) resulting damages." *State Farm Fire & Cas. Co. v. Williams,* 926 So. 2d 1008, 1013 (Ala. 2005).  The parties do not challenge that the mortgage represents a valid contract between the parties.  And, although evidence exists that Dysart was in default under the mortgage, the mortgage contract contemplates that defaults may occur and contains provisions that address the obligations of the parties when default occurs. Those post-default obligations are at issue in this lawsuit.

In her breach of contract claim, Dysart argues that Trustmark breached the mortgage contract in accelerating the note and foreclosing without providing Dysart with proper notice under paragraph 22 of the mortgage contract.  Trustmark claims, however, that the company provided notice sufficient to satisfy the mortgage contract and Alabama statutory law through documents such as the motion to lift the stay in the bankruptcy action and Trustmark's written communications to Dysart's attorney dated July 20, 2007 and August 7, 2007,  as well as through other communications among the attorneys in the bankruptcy action.

28

The court first examines the mortgage contract itself to determine the notice it required; two provisions address notice: paragraphs 15 and 22.  Paragraph 15 speaks more to the method of delivery than the notice content, requiring written notice either mailed by first class mail or, if by other means, notice actually delivered to the notice address.  Paragraph 15 also states that "[i]f any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Agreement."

Paragraph 22 of the mortgage in question, which speaks specifically to notice of acceleration of the debt, is a standard mortgage provision found in countless mortgages across the country; the Alabama Supreme Court has repeatedly analyzed that language in connection with claims of breach of  notice requirements in foreclosure cases.  That paragraph states that the notice shall contain the following information: "(a) default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums ... and sale of the Property[;]" and finally, (e) the right to reinstate after acceleration and the right to bring a court action asserting defenses to the acceleration and sale.

In *Jackson v. Wells Fargo Bank,* 90 So. 3d 168 (Ala. 2012), the Alabama Supreme Court determined that this provision required both *a notice of intent to accelerate*, with information about how to cure the default and a deadline to cure of 30 days or more from the notice, and a separate, subsequent *notice that the debt has been accelerated* if the mortgagor does not cure.   It also found that notice of intent to accelerate was a condition precedent to acceleration; the

detailed notice of intent with the grace period provided the mortgagor the information about how to defeat acceleration before acceleration occurred. *Id.* at 172-73.

In the instant case, Trustmark sent four documents to Dysart and/or her attorney of record that it claims provided sufficient notice to her under the mortgage: a motion to lift the bankruptcy stay in January of 2007; an amended motion in February of 2007; a July 20, 2007 letter; and an August 7, 2007 letter. The motion as amended stated that Dysart was in default on the mortgage for failing to pay insurance and taxes, that Trustmark had notified Dysart of the default in October of 2006, and that Trustmark was accelerating the debt. Because the October letter is not part of the record and because Dysart denies receiving it, the court must disregard any claims about its contents. At best, then, the motion to lift stay as amended represented notice to Dysart that she was in default and notice to Dysart that Trustmark was accelerating the debt without prior notice of Trustmark's intent to accelerate.

Obviously, the motion as amended did not provide actual notice of all items specified in paragraphs 15 and 22 of the mortgage contract. It was written notice that Dysart acknowledges receiving at her notice address, so it complied with paragraph 15. However, it was not a notice of *intent to accelerate* providing the action needed to cure the default and a deadline of at least 30 days to cure before acceleration. As the Supreme Court found in the *Jackson* decision, such a separate notice of intent is a condition precedent to acceleration, and Trustmark did not show that it had provided that separate notice prior to the notice of acceleration in the motion as amended. Therefore, the motion as amended did not, *by itself,* represent actual notice complying with all requirements of paragraph 22.

The court notes that Dysart complains that the motion as amended is a court filing, not a

letter, and cannot serve as notice.  The court disagrees; the document providing notice can be in the form of a letter, a memo, a court document, etc. as long as the document communicated the required information.  Dysart supplies no law stating otherwise, and this court is aware of none. However, the court also notes that Trustmark could have avoided much effort and legal fees if it had sent letters to Dysart's notice address clearly setting out the notice elements required in paragraph 22 of the mortgage, with one letter declaring its intention to accelerate and stating the default, the actions required to clear the default, and a deadline of 30 days or more to do so, and further, another letter after the grace period clearly declaring acceleration of the debt and the remaining information listed in paragraph 22.

The court next turns to the July and August communications to see if they rectified the omissions in the motion as amended.  The July 20 letter provided information about actions that Dysart needed to perform to cure the default, listing amounts owed for past-due property taxes and Trustmark fees.  Although the motion as amended had previously indicated that Trustmark was accelerating the note on the mortgage, this document reflects instead that Trustmark would still allow Dysart to cure the default by paying these amounts due *instead of* paying the accelerated amount, but advised Dysart's attorney that foreclosure on the property would begin after the August 22 hearing.  The July 20 letter gives a 7-day grace period instead of the 30-day period required in paragraph 22; however, the follow-up email between the attorneys on August 7, 2007 stated that no foreclosure proceedings will occur until after August 22, 2007, more than 30 days from the July 20 letter.  These communications, when taken together, provide written notice of default, of actions required to cure default that include paying an unaccelerated amount, a deadline of more than 30 days in which to cure the default, and a communication that the

31

failure to cure by the deadline would result in foreclosure on the property.

After August 22, 2007, the Bankruptcy Court entered an order authorizing Trustmark to proceed with foreclosure, and  communications between attorneys for Dysart and Trustmark after August 22, 2007 confirmed that Dysart could not pay the unaccelerated amount to cure the default, and that Trustmark would proceed with the foreclosure.  Dysart does not dispute that Trustmark published notice of the foreclosure sale in accordance with Alabama law, set out in § 35-10-13 of the Alabama Code.  These communications reflect Trustmark's decision, communicated to Dysart's attorney, to proceed with acceleration and foreclosure.

Dysart objects that these July and  August communications, and communications occurring between Trustmark and her attorney, did not represent actual notice to her by mail to the address listed in the mortgage contract.  However, communications to Dysart's attorney are, at the very least, constructive notice to her.  *See Sanders v. Flournoy,* 640 So. 2d 933, 939 (Ala. 1994) (finding that statements to a party's attorney constituted notice to the party, and stating that "[k]nowledge of the attorney will be imputed to the client if the knowledge comes to the attorney while engaged in a service for the client after the attorney-client relationship has commenced."). These communications occurred during a period where the parties were involved in legal proceedings with both sides being represented by attorneys.  Under these circumstances, communications directly to Dysart instead of through her attorney would arguably be inappropriate, and, in any case, communications through her attorney were appropriate.  Dysart does not argue that her attorney did not represent her at the time of the communications, and she does not claim that her attorney defrauded her or acted outside the scope of his authority when communicating with Trustmark.  The court finds that actual notice to her attorney under the facts

32

of this case was notice to Dysart.

The Supreme Court of Alabama addressed a similar issue and affirmed the grant of summary judgment in favor of the defendant mortgage company on a breach of contract claim addressing notice provisions identical to paragraph 22 and similar to paragraph 15. *See Redman v. Federal Home Loan Mortgage Corp.,* 765 So. 2d 630 (Ala. 1999), *rehearing denied* (March 10, 2000). The court held that constructive notice established compliance with those provisions where the plaintiff denied receiving actual notice of default and foreclosure. The Supreme Court noted that, although the plaintiff had not opened mail from the defendant with the required notices and denied receiving actual notice of default or returned payment checks, she clearly knew of the arrearages in her bank account affecting mortgage payments and saw the default letter regarding the mortgage during her divorce trial prior to the foreclosure sale. The Supreme Court cited with approval its prior holding "that to close one's eyes to facts and circumstances reasonably apparent to the ordinary person does not relieve one of the responsibility of what the facts would have revealed if the inquiry they inspired had been made." *Id.* at 634. No dispute existed that the defendant complied with Alabama law regarding publishing notices in newspapers advertising the foreclosure sale. The Court concluded that the plaintiff had "notice of facts sufficient to cause [her] to make further inquiry as to the status of [her] mortgage account" and had "notice of everything to which a reasonable inquiry would have led [, including] notice of the default and foreclosure sale." *Id.* at 635. Thus, the Court found that the defendant had complied with both the mortgage provisions and Alabama statutory law regarding notice and that the plaintiff did not create a triable issue of fact on the breach of contract claim. *Id.* at 635-36.

33

The court recognizes that the unopened notices in *Redman* may well have done a better job of clearly and succinctly stating the acceleration notice information required in the mortgage contracts than did the communications in the instant case.  While Dysart did not refuse to open notice letters, like *Mrs. Redman,* she did ignore communications that provided her with actual and/or constructive notice of the information needed to cure the default.   Unlike so many foreclosure cases complaining of notice, this case is not one of surprise that she was in default, of surprise that the debt was accelerated, of surprise about the amount to cure, of surprise about the time in which to cure, of surprise that the stay in bankruptcy was lifted, or surprise that Trustmark was foreclosing on her house.  No surprise existed here.  Dysart did not file any opposition to the motions to lift the stay, and the negotiations among attorneys about paying some amount to avoid foreclosure were over at the time the foreclosure actually occurred.  Dysart communicated to Trustmark through her attorney that she simply did not have the money to bring the unaccelerated debt current and that she could only pay $300 extra per month, an amount unacceptable to Trustmark to cure the arrearage, as Trustmark had advised her prior to foreclosure.  Although Dysart argues in her opposition brief that she "would not have let her home get foreclosed on if she had been made aware of these emails" [between Trustmark's attorney and her own] (doc. 53, at 13-14), she does not provide any *evidence* disputing the information her attorney provided to Trustmark that she could not pay the unaccelerated arrearage before foreclosure.

The court further recognizes that losing one's home is traumatic, and the trauma to Dysart is arguably evident in the fact that she has filed *four* lawsuits over the event.  But, the court FINDS that Trustmark notified her of everything it was required to do contractually and

statutorily, with the exception that no evidence reflects that it specifically notified her of the right to reinstate the mortgage after acceleration and the right to bring a lawsuit.  As to the right to reinstate, Dysart claims to have reinstated her mortgage after acceleration in 2004, and if that claim is correct, she already understood that process.  She had advised Trustmark through her attorney that she did not have the finances to pay the unaccelerated amount required to reinstate and does not provide evidence in this lawsuit that her attorney mispoke and that she could have paid that full unaccelerated amount required before foreclosure if she had had proper notice.  As to the right to bring a lawsuit, Dysart has resorted four times to filing a lawsuit regarding the foreclosure process.  In light of that information, the court FINDS that Dysart could have no plausible claim for damages caused by those particular notice deficiencies.   Accordingly, as to the remaining breach of contract claim, the court FINDS that Trustmark's motion for summary judgment is due to be GRANTED and that Dysart's motion for summary judgment on the remaining breach of contract claim is due to be DENIED.

The court notes that paragraph 15 of the mortgage contract states broadly: "If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument."  (Doc. 1-1, at 33).  Dysart does not dispute that Trustmark complied with Alabama statutory law in § 13-10-13 under the chapter on mortgages entitled "Notice," requiring notice of foreclosure sales be given by publication once a week for three successive weeks in a newspaper published in the county where the property to be sold is located.  As an *alternative* ruling, the court FINDS that Trustmark complied with this statutory notice provision by publishing three successive weeks in a newspaper; that, pursuant to paragraph 15, it has satisfied the corresponding notice requirement

under the mortgage contract; and thus, that  Trustmark's motion for summary judgment is due to

be GRANTED on the remaining breach of contract claim.  Consistent with that ruling, the court

FINDS that Dysart's motion for summary judgment is due to be DENIED.

Because of these rulings, the court need not and does not reach Trustmark's argument that

Trustmark did not need to comply with paragraph 22's acceleration notice requirements because

the tax sales of the property invoked paragraph 18's exception to paragraph 22 notice.  Further,

the court need not and does not reach Trustmark's argument that Dysart's failure to redeem or

reaffirm her debt extinguished any right she had to the Manchester Court property, including the

right to notice.

The court will enter a separate Order consistent with this Memorandum Opinion.


Dated this 28th day of April, 2015.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE